UNITED STATES DISTRICT COURT
EASTERN  DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA              Indictment 12CR668
                                      Information 13Cr264


                    -v-


SHAKA STAYMAN,

        Defendant.

_____


_____
        SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF
                    SHAKA STAYMAN
_____




                        Donna R. Newman
                        Attorney for Defendant
                        SHAKA STAYMAN
                        20 Vesey Street, Suite 400
                        New York, New York 10007
                        (212)229-1516
                        donnanewmanlaw@aol.com




Dated:  October 14, 2014

**PRELIMINARY STATEMENT**

Shaka Stayman stands before this Court for sentencing upon his plea of guilty

to Indictment 12CR688 and Information 13Cr264. Both charged offenses concerned

Stayman's participation in conspiracies to obtain money from financial institutions

through Stayman's misrepresenting himself as the account owner of accounts held at

the financial institutions and convincing the financial institution to transfer money out

of the targeted account into an account the conspirators controlled. In both cases

Stayman used personal identification information ("PII") of the account holder

which he had obtained from a middleman who obtained the information from an

"insider."

Stayman has been incarcerated for over 2 years-actually 28 months. During this

time, he had reflected upon his offenses, the harm he caused others, his family, and

himself. His remorse is deep and genuine. He is determined to prove to himself and

to his family that he is worthy of their love and support. He will not disappoint again.

For the reasons stated, a sentence of 40 months, a variance from Stayman's

Guidelines sentencing range of 87-108 months[1], is a sentence that is sufficient but not

---

[1]Under Probation's calculation, Stayman's sentencing range is 135 to 168. PSR ¶ 116. The difference between the defense calculation and Probation's is the four level role upward adjustment imposed by Probation. The Government concurs with Stayman that a role enhancement is not warranted. *See* Discussion *supra.*

greater than necessary to satisfy the goals of sentencing. *See* 18 U.S.C. § 3553(a). Further, the imposition of restitution should be limited to actual losses and not include incidental costs which are not authorized by the Mandatory Victims Restitution Act, 18 US.C. § 36633A *et seq* .

**OFFENSES**

On May 1, 2013, Shaka Stayman plead guilty before Your Honor to participating in two different, albeit similar fraudulent schemes. These frauds arose out of conduct in two different jurisdictions-the Eastern District of New York ("EDNY") charged in Indictment 12Cr688 and the Western District of North Carolina ("WDNC") charged by Information and transferred to the EDNY pursuant to Fed.R.Cr.P. 20. Stayman plead guilty to Count One of the EDNY Indictment which charges him with conspiring with others from 2007 through 2012 to devise a scheme to obtain  money and property by the unauthorized use of deceased Brooklyn residents ("DBR's")  PII stolen from the Kings County Public Administrator's Office ("KCPA") who was the executor of these DBR's estate, by falsely representing he was the account holder  to financial institution(e.g. Genworth Financial) which held DBR's accounts, and by false representation transmitted by telephone and  by wire transmission to the financial institutions authorized the transfer of  funds out of the DRB's account into an account controlled by the conspirators, in violation of 18

U.S.C. §§ 1349 and 1343. (Hereinafter "KCPA fraud"). In addition, Stayman plead guilty to a single-count WDNC Information which charges him with conspiring to commit wire fraud between June 2010 and November 2010 to obtain funds, under a scheme similar to that utilized in the KCPA fraud, from The Teachers Insurance and Annuity Association-College Retirement Equities Fund ("TIAA-CREF") in violation of 18 U.S.C. §§ 1349 and 1343.(hereinafter "TIAA-CREF" fraud).

**FAMILIAL BACKGROUND**

Shaka Stayman is thirty-three. He is diminutive in statute, somewhat shy, but gregarious and warm once he is comfortable in his surroundings. He thrives on learning and is an avid reader.

Stayman is fundamentally a family man and without question has the love and support of his family. His brother, Rawle Stayman, describes his brother as someone who has " a heart of gold." This is confirmed by all his friends and family who submitted letters to Your Honor to provide the Court with insight as to how he is perceived by those who know him best. *See* Letters submitted under separate cover dated October 13, 2014.

Stayman, despite being raised in a warm and loving household, mainly by his mother as a single parent, did not have an easy childhood. He suffered from juvenile arthritis which caused him to be bed ridden for much of his childhood. As a result, he

tends to be shy and feels most comfortable among his immediate family.

He became a father quite young-at the age of eighteen. Rather than abandon or run from the situation, he embraced it, as he did fatherhood. Despite what else one may say about Stayman, no one can dispute that he is a good father. *See* Letters from his children sent under separate cover. He has provided support for all his children and has been totally involved in their upbringing. In fact, the money he made from his illicit conduct went to their support. He rarely indulged himself with luxury items.

His willingness to assist others in a positive manner is apparent even in jail. At the Metropolitan Detention Center where he is detained, other inmates have informed counsel that Stayman is someone they have turned to for his sage advice and comfort. He has patience to listen and directs them to look into their own souls for answer. Stayman is someone who has talent and intelligence that he intends to use to better the community. *See* Shaka Stayman letter submitted under separate cover. Stayman is eager to reenter society, do good for himself, his family, and his community.

**A GUIDELINE SENTENCE IS EXCESSIVE: A NON-GUIDELINE SENTENCE SERVES THE GOALS OF SENTENCING.**

APPLICABLE LAW

In determining a sentence, the court is directed to impose a sentence sufficient, but not greater than necessary, to comply with . . .the need for the sentence to: (A)

4

reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; ( C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care. 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, in light of the aforementioned, the sentencing judge is to consider the advisory Sentencing Guidelines and its policy statements, the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); *United States v. Cavera*, 550 F.3d 180, 189-190 (2d Cir. 2008); *United States v. Crosby*, 397 F.3d 103, 111-12 (2d Cir. 2005). A court must consider what weight to accord the Guidelines in its assessment of all the 3553(a) factors. It is not an abuse of discretion for a court to vary from the Guidelines sentence even in a run-of-a-mill case based solely on policy consideration, or because a specific guideline fails to reflect § 3553(a) considerations, or is not based on empirical evidence, or is not based on national experience. *See Kimbrough v. United States*, 552 U.S. 85, 96 (2007); *Gall v United States*, 552 U.S. 38, 46 & n2 (2007); *Nelson v. United States,* 555 U.S. 350 (2009).

## DISCUSSION

## THE CORRECT TOTAL ADJUSTED OFFENSE LEVEL IS 28 AND NOT 32 AS PROPOSED BY PROBATION.

### A Role Enhancement Is Not Warranted

Probation's Guidelines calculation differ from the parties[2] because Probation includes in its computation a four level role adjustment *See* PSR ¶'s 11, 66. Stayman objects to this enhancement because no role adjustment is warranted. His participation did not equate to an organizer, leader, supervisor, or manager within the meaning of guideline 3B1.1(a-b). The Government concurs.

Probation's assessment of Stayman appears to be based on his participation as an essential member of the conspiracies. The fact that a defendant is important to the success of a venture is not a sufficient basis for a leader or organizer enhancement. *See e.g. United States v. Egbert*, 562 F.3d 1102-1104 (10th Cir. 2009). A review of the material facts of Stayman's participation reveal his involvement did not include management or control over other conspirators. *See* U.S.S.G. § 3B1.1(a); see also, *Id.* application n. 3.

---

[2]The government in the parties plea agreement provided the following Guideline calculations: Base Offense level 7, plus 18 for intended loss, plus 2 for more than 50 victims, plus 2 for sophisticated means equaling a total offense level of 31. An adjustment of 3 levels for acceptance of responsibility results in an adjusted offense level of 28.

Stayman did not devise any of the schemes in which he participated. These scams are commonly used and known. They have been widely utilized by others before Stayman and continued to be used after he aborted from all conspiracies. His participation was controlled by those conspirators (middleman) who obtained the account holders PII from their sources. Stayman had no direct access to inside information. Stayman was recruited by the middleman to execute the scheme. He worked alone to accomplish the transfer of the funds. Once the transfer was complete, Stayman paid the source who paid the other participants. Stayman's knowledge of the insiders was limited and controlled by the middleman. Stayman did not receive a greater percentage of the monies obtained. In short, he was a cog in the wheel whose role was clearly defined. Moreover, with its full understanding of all the schemes and all the players, the government agrees with Stayman that a role enhancement is not warranted. Accordingly, the Court should not impose a role enhancement.

## THE FRAUD GUIDELINE SHOULD BE GIVEN LITTLE WEIGHT/A NON-GUIDELINE SENTENCE IS APPROPRIATE

### a.The Fraud Guidelines as Applied Here Are Excessive

As stated above, post-*Booker* the Court must consider the Guidelines but is free to reject any portion of the Guidelines even in a run-of-the mill case. *See e.g. Kimbrough,* 552 U.S. at 96; *Gall v United States*, 552 U.S. 38. The fraud Guidelines focus solely on aggregate monetary loss and do not account for the other §3553(a)(1)

factors. *See United States v. Ovid*, slip op., 2010 WL 3940724 at *1 (E.D.N.Y Oct. 1, 2010)("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so."). The fraud Guidelines in general as applied to the average offender are overly harsh because they are loss based only and are not based on empirical data or past practices, and most importantly fail to take into consideration even regularly occurring mitigating characteristics and circumstances of offenders. *See*, *Id; see also, United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y 2008); *United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y 2006); *United States v. Herink*, 2012 WL 311202 *5,7; 10Cr169 (D.Neb. June 30, 2012)(unpublished*)*;Raymond, Nate,"Rakoff Says Sentencing Guidelines Should Be "Scrapped,*"* Thomas Reuters News & Insight, (March 12, 2013),http://newsandinsight.thomsonreuters.com/ Securities/News/2012/03  -  March/Rakoff.

Judge Rakoff, noted in *Gupta*, the spiraling increases in the fraud guideline loss table have draconian results, yet, there is lacking  empirical data to support the upward increases of the table. He stated:

> Take the hypothetical but typical case described by
> Professor Kate Stith of Yale Law School, involving a

typical securities fraud defendant who pled guilty to
inflating the financial figures of a public company, thereby
causing at least 250 shareholders to collectively suffer a
reduction of more than $12.5 million in the value of their
shares. In 1987, such a defendant would have faced a
Guidelines sentence of 30–*37 months; but by 2003, the
same defendant would have faced a Guidelines sentence of
151–*188 months, a more than 500% increase. *See* Kate
Stith, Federal Sentencing: The One–*Way Ratchet, New
York City Bar Association First Annual Conference on
White Collar Crime (May 2012). Was such a crime really
500% worse in 2003 than it was in 1987? Had any of the
factors that underlie rational sentencing so radically
changed as to warrant such a huge increase?

*Gupta*, 904 F. Supp. 2d at 351.

The Commission concedes that in drafting the fraud Guidelines and in

particular the method utilized to calculate loss, is not based on empirical data or past

practices or on national experience. *See*, e.g.,United States Sentencing Commission,

"Fifteen Years of Guidelines Sentencing; An Assessment of How Well the Federal

Criminal Justice System is Achieving the Goals of Sentencing Reform" (Nov.

2004)("Fifteen Year Assessment") at 56 & Executive Summary at vii, 15, 469 (The

Commission conceded that it did not employ empirical data when setting the

Guidelines ranges for white-collar crimes.).  It is therefore not surprising that only

51% of §2B1.1 sentences were within the guideline range in fiscal year 2011. U.S.

Sentencing Commission, *2011 Sourcebook of Federal Sentencing Statistics*,

http://ww.ussc.gov/research and/statistics/ annual_reports_sourcebook. Accordingly,

in as much the Commission in drafting the loss table veered from its institutional role, it is not an abuse of discretion for this Court to categorically reject the guideline calculation in this "mine-run" case. *See, Kimbrough*, 552 U.S. at 96; *Spears v. United States*, 129 S.Ct. 840, 843-44 (2009).

Stayman's offense level of 7 is increased by 24 levels by application of the loss table (18 level increase for the loss in excess of $2,500,000) coupled with the § 2B1.1 specific characteristic upward adjustments(4 level victim increase as per §2B1.1(b)(2)(4); 2 levels are added for the use of sophisticated means under 2B1.1(b)(1)( C)) thereby resulting in a unreasonably sentence[3]. *See* PSR ¶'s 61-66.

Here the 18 level loss increase includes both actual and intended loss and includes loss for all related conduct which was discovered as a result of Stayman's post-arrest statements and his consent to have his computer and his phones searched. *See* PSR ¶'s 61-62. Notably, the actual loss to TIAA-CREF was $212,999.00 (no individual fund participant lost money) which was 1/5th of the $1,145,611 loss. And the $1,145,611 loss comprised over 1/3rd the total loss claimed by Probation for §2B1.1 loss computation. This actual loss verses intended loss differential percentage in the TIAA-CREF is similar in the other like TIAA-CREF schemes included as

---

[3]Probation then adds an additional four level role adjustment which both the Government and the defense dispute-See Discussion above.

relevant conduct in the loss calculation. Yet, the loss table does not account for this differential and treats equally those scams that involved actual loss to individual investors who then were unable to recoup their losses (i.e. Madoff) to those scams which were less than successful, such as the TIAA-CREF fraud. In other words, the loss table fails to reflect that at least if not more than one third of the time, the fraudulent schemes in this case were not successful. This also suggests that contrary to Probation's characterization of Stayman, he was not as clever or successful as they contend.

Further, the Commission's attempt to achieve uniformity through the loss table, as applied here produces a disparate sentence. The 18 level increase includes a wide margin of losses-from over 2,500,000 to 7 million. Here where the loss attributed to Stayman is at the lower end of the losses falling within the 18 level increase and when the actual vs the intended loss differential is considered, the disparity of the 18 level increase and the resulting sentence is clear.

b. The Policy Rationale Behind the 2009 Amendment Expanding § 2B1.1 Definition of "Victim" Does Not Apply Here.

Stayman does not dispute under § 2B1.1 applicable definition of "victims" the sum total of victims of his offenses of conviction(which includes relevant conduct) is 50 or more and thus a 4 level specific characteristic addition is appropriate. *See* §2B1.1(b)(2)(4). Nonetheless, the Court in its sentencing determination should

consideration, the number of victims reaches 50 here as a result of the 2009 amendment to § 2B1.1 which expanded the definition of victim in cases involving the use of PII. Prior to 2009, §2B1.1 defined a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 cmtn. n. 1. "Actual loss" under subsection (b)(1) required some "pecuniary harm" that is monetary or otherwise readily measurable in money." *Id*. at cmt. n. 3(A)(i)(iii). In 2009, the Sentencing Committee by amendment 726 to the Guidelines expanded §2B1.1's definition of "victim" in "cases involving means of identification" to include "any individual whose means of identification was used unlawfully or without authority" regardless of whether they suffered a monetary loss. *Id*. at cmt.n 4(e) (2009). The Sentencing Commission explained the amendment was meant to account for individuals who did not suffer a monetary loss but who were burden with the problems attached to correcting their credit problems resulting from the fraud. *See* U.S.S.G. app.C supp., amend. 726. The Amendment was in response to various courts which had not counted as victims, individuals whose identity had been stolen but because they were reimbursed by e.g. credit card companies, for any loss incurred they had no actual loss. *Id.*

          _____ The Commission determined that such an individual should be considered a "victim" for purposes of subsection (b)(2) because such an individual, even if fully reimbursed, most often spend significant time resolving credit problems and

related issues, and such lost time may not be adequately
accounted for in the loss calculations under the guidelines.

*Ibid.*

Here, however, since TIAA-CREF immediately reimbursed those accounts from which money was actually transferred, no TIAA-CREF victim lost money. Importantly, no TIAA-CREF fund participant whose PII information was used needed to do anything to restore their credit or any related credit issues because it was never in real jeopardy. The same occurred with the other relevant conduct schemes where the victims account were reimbursed when the company discovered the fraud. The KCPA scheme utilized PII information of deceased individuals. Thus, in this case, where the fraudulent scheme ended only in an attempt, the PII unauthorized use did not cause any victim to loss money or spend "significant time resolving credit problems." Accordingly, because the harm to the "victims" who did not suffer an actual monetary loss, also did not include an expenditure of a significant amount of their time to resolve credit problems, the Court should minimize the effect of the 4 level increase to Stayman's sentence through a non-guideline sentence.

## THE COURT SHOULD DISCOUNT STAYMAN'S PLACEMENT IN CRIMINAL HISTORY CATEGORY II.

The parties in their plea negotiations considered, in error, that Stayman fell within Criminal History Category I and that his guideline range was 78-97 months. Probation assessed Stayman two points because his involvement in the offense of

13

conviction began before his term of probation on his 2006 conviction expired. *See* PSR ¶ 82. Notably, while the EDNY Indictment charged a conspiracy from 2007, Stayman's participation began in 2009 and that participation was limited to a few instances. His five year term of probation ended in 2010. But of more significance, placement of Stayman in Criminal History II, fails to distinguish him from those offenders who have two prior felony convictions or offenders who received a lengthy term of imprisonment for a prior conviction or offenders who committed violent crimes. Moreover, lacking is empirical data to support a 2 level increase as opposed to a one level increase as provided for by guideline 4A1.1(d).

In light of these factors, the Court should reject the mandate of 4A1.1(d)*,* and in its sentencing determination, consider Stayman's criminal history category as I. *See*, e.g. *Kimbrough* 552 U.S. at 96; *Gall*, 552 U.S. at 46 & n2.

## THE PROPOSED NON-GUIDELINE SENTENCE MEETS THE GOALS OF SENTENCING.

A sentence of 40 months is a serious sentence and one that adequately punishes Stayman and sends a message to the community-at-large. Stayman does not pose a danger to the community. He has clearly demonstrated a desire to change his life and continue as a productive law abiding citizen. Specific deterrence is not an issue.

Stayman will be in his mid-thirties if the requested sentence is imposed. This is important as all research demonstrates that recidivism rates decline with age. *See*

*e.g.* USSC, *Measuring Recidivism*: *The Criminal History Computation of the Federal Sentencing Guidelines,* Ex.9 (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/publications-research/2004/200405_Recidivism_Criminal_History.pdf.; last accessed 10/11/2014.

His family ties, including his strong ties to his children indicate that he is less likely to recidivate. *See* Solangel Maldonado, *Recidivism and Parental Engagement*, 40 Family l.Q. 191 (2006)("the literature...suggests that ex-convicts who share close relationships with their children are less likely to recidivate than those who do not."). Further, inmate parents with "less time to serve reported more frequent contact with their children" than those serving longer prison sentence." Lauren E.Glaze & Laura M. Maruschak, Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice, *Parents in Prison and Their Minor Children* (2010), http://www.bjs.gov/content/pub/pdf/pptmc.pdf . A sentence of 40 months will allow Stayman to soon return to his family and allow him to continue to be involved in their formative years. And of course, this will not only benefit Stayman but also his children. *See* Sara Wakefield & Christopher Wildeman, *Mass Imprisonment and Racial Disparities in Childhood Behavioral Problems*, 10 Criminalology& Pub. Pol'y 793, 806 (2011)(finding strong link to children who have problems in) .

Imposing a sentence in excess of 40 months is excessive and will not achieve

general deterrence. The National Institute of Justice recently placed on their web site a one page flyer entitled "Five Things About Deterrence" which is based on Daniel Nagin's essay "Deterrence in the 21st Century," in *Crime and Justice in America: 1975-2005* (ed. Michael Tonry, University of Chicago Press, 2013)[4]; last accessed 10/11/2014 at: http://www.nij.gov/five-things/Pages/deterrence.aspx. Among the five things mentioned are: "increasing the severity of punishment does little to deter crime" and "sending an offender to prison isn't a very effective way to deter crime." *Id.* As recently as this April, The National Academies[5] issued a news release on their website reporting on the National Research Council Committee report on the Causes and Consequences of High Rates of Incarceration.*See* http://www. nationalacademies. org/onpinews/newsitem.aspx?RecodID=18613;last accessed 10/11/2014.The Committee's comprehensive evaluation of the data regarding the benefits and effect of incarceration lead them to "conclude that the cost of the current rate of incarceration outweigh the benefits." *Id.* Specifically, the Report concluded that "the deterrent effect of increases in lengthy prison sentences is modest at best." *Id.* Nagin

---

[4]Daniel S.Nagin's aricle is also available at 42 Crim & Just. 199, 201 (2013)(herenafter, Nagin, "Deterence.

[5]This organization is comprised of the National Academy of Sciences, National Academy of Engineering, Institute of Medicine and National Research Counsel.

in his notable work on the topic reached the same conclusion:"[T]here is little evidence that increases in the length of an already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs." Nagin, "Deterrence." at 201; *see also*, Gary Kleck & J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is there a "Collective Wisdom"?,* 59 Crime & Delinq. 1006, 1031-33 (2013) (Concluding "that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms...").

Accordingly, a sentence of 40 months is sufficient bu not greater than necessary to meet the goals of sentencing. *See* U.S.S.G. § 3553(a).

## II. PROBATION'S PROPOSED RESTITUTION ORDER INCLUDES EXPENSES NOT COMPENSABLE UNDER THE MVRA.

It is undisputed that Stayman's offenses of conviction, both of which involved fraud, are offenses which the MVRA requires the payment of restitution to the victims who suffered a loss. *See* 18 U.S.C. §3663A(c)(1)(A). Probation proposes a restitution order in the amount of $1,342,735.94- $791,528.70   to TIAA-CREF and the remainder of the amount to the four victims of the KCPA fraud. *See* PSR ¶ 128. With respect to TIAA-CREF, besides the actual dollar loss of $20,747.45 incurred by TIAA-CREF (no TIAA-CREF fund participant incurred a monetary loss),  Probation includes $540,382 TIAA-CREF allegedly paid to a public accounting firm to assist the internal investigations team in reviewing daily incoming withdraw requests on

TIAA-CREF participant accounts; and the $5,500 TIA-CREF allegedly paid for crediting monitoring of accounts. *Id.* Probation did not include $36,398 TIAA-CREF claimed they incurred in legal expenses to file a civil lawsuit and obtain subpoenas. Probation concluded this expense was not necessary for the investigation or prosecution of the offense. *See* PSR ¶ 41.

The Government in its October 6, 2014 letter to Probation asserts it has no position concerning whether the $5,500 for crediting monitoring should be included as restitution but does states that the attorney fees of $36,398 and the cost of the internal investigation should be included.

Probation's and the Government's err in their analysis of the costs compensable under MVRA. The attorney's fees, the accounting fees, credit monitoring expenses, claimed by TIAA-CEF are not compensable under the MVRA. They were not incurred in connection with the investigation or prosecution of this case and thus, were not necessary within the meaning of the MVRA. *See* 18 US.C. 3663A(b)(4). Restitution to TIAA-CREF should be limited to the actual dollar loss of $220,747.45[6]. Any dispute as to the proper amount or type of restitution shall be resolved by the

---

[6]The actual loss amount based on the discovery received was $220,747.45. We suggest that the $245,646.70 figure offered by TIAA-CREF is in error. For example, the PSR charts contains a notation for Holly Novitski $20,734.22 and for Kristen Novitski $20,734.22 but these are one and the same and not two different transactions.

court by the preponderance fo the evidence.

APPLICABLE RESTITUTION LAW

The Court's authority to order restitution is limited to that conferred by Congress in the MVRA. *See United States v. Maynard*, 743 F.3d 374 , 379 (2d Cir. 2014). Restitution can only be ordered for the offenses for which the defendant was convicted. *See Hughey v. United States*, 495 U.S. 411(1990)(Restitution may be ordered "only for loss caused by the specific conduct that is the basis of the offense of conviction.").*Id*. at 413. The MVRA requires that the loss must be direct and proximate caused by the offense conduct. *See*, 18 U.S.C. §3663A(a)(2).

In *Maynard*, the Second Circuit held that "only those expenses specifically enumerated in § 3663A(b) are compensable under the MVRA." *Id* at 378. The enumerated expenses are expenses that are "*necessary ...* expenses incurred *during the participation in the investigation r prosecution of the offense or attendance at proceedings related to the offense*." 18 U.S.C.3663A(b)(4)(emphasis added). *Necessary* in this context, the Court held is limited to those expenses "the victim was required to incur to advance the investigation or prosecution of the offense." *Id* at 381 (emphasis added). In reaching this conclusion, the *Maynard* Court relied on its prior decisions in *Amato and Bahel. Id* at 381. In *Amato* the Second Circuit affirmed the imposition of attorney fees and accounting costs because this work was utilized by

19

the government in its investigation and prosecution of its criminal case against the defendant. *Id*. at 38(citing *United States v. Amato*, 540 F.3d 153, 159-60, 162 (2d Cir. 2008). For a similar reason, the imposition of attorney's fees were affirmed in *Bahel. See Maynard*, 743 F.3d at 381*(*citing, *United States v. Bahel*, 662 F.3d 610, 647-48 (2d Cir. 2011)(Affirming use of outside law firm which assisted the United Nations in its efforts to aid the Government in its prosecution of one its employees involved in a fraud against the United Nations). The *Maynard* Court underscored that in both these case" the internal investigation paid for by the victims unmasked fraud and led to investigations or assisted" authorities in their investigation and prosecution. *Id*. at 381.

In *Maynard,* the defendants, who were convicted of bank robberies, objected to the imposition of restitution for additional expenses incurred by one victim back. The Court rejected all expenses which did not fall under the four categories enumerated in §3663A(b). *Id. Maynard* limitation of restitution to the four categories omits attorney fees and costs incurred in the attempt to recover their losses.

More recently the Second Circuit in *United States v. Cuti*, _F.3d_, 2014 WL 4452976, at *8 (2d Cir. Sep. 11, 2014), provided further clarification of expenses that constitutes "necessary" expenses for the purposes of imposing restitution. Anthony Cuti was convicted of conspiracy to make false statements and four counts of

securities fraud in connection with two different fraudulent accounting schemes. The investigation into Cuti arose out of an arbitration proceeding he initiated against the private equity firm who acquired Duane Reade ,claiming damages resulting from his termination without cause. Paul, Weiss, Rifkind, Wharton & Garrison, LP represented Duane Reade at the arbitration. Paul Weiss uncovered several suspicious accounting entries. Duane Reade then retained independent counsel and a forensic accounting firm to conduct an internal investigation. The results of the internal investigation were reported to the U.S.Attorney's office and this led to the prosecution of Cuti. The Court concluded that the Paul Weiss fees were not "necessary expenses" since those fees were incurred in defending Duane Reade in the arbitration of disgruntled former executive." *Id*. at * 9. The Second Circuit concluded the "entirety of the expenses incurred by Duane Reade for both the Colley and the Paul Weiss internal investigations, premised on the same underlying findings and conduct, cannot have both been "necessary' to advance the government's investigation..." *Id*. at *9. The *Cuti* Court went on to explain that "to be necessary" for restitution, it is not enough that the expenses incurred "*helped* the investigation..." *Id.* at 10. The Second Circuit remanded to the district court to determine "whether the government has proved by a preponderance of evidence that some, or any, of Paul, Weiss's and Cooley's expenses prior to May 22, 2007 were "necessary to the investigation or prosecution"

of Cuti's criminal case. *Id*. at 10 (citing, *Maynard*, 743 F.3d at 382; *Amato*, 540 F.3d at 161)).

DISCUSSION

Although these collateral expenses have been claimed by TIAA-CREF, no documentation to support a finding of "necessity" have been provided to support the claim. It is clear based on *Cuti,* as well as, *Maynard*, that the attorney fees incurred in TIAA-CREF for pursuing a civil action are not automatically compensable under the MVRA. Likewise not automatically compensable is the $540,382 paid to a Public Accounting Firm to assist the internal investigations team in reviewing daily incoming withdraw requests on TIAA-CREF participant accounts. Unless and until documentation demonstrates by a preponderance of the evidence "necessity," the Court is without a basis to find the internal investigation was initiated as a direct result of the fraudulent activity from June 2012 to November 2012 in which Stayman participated as opposed to other fraudulent activity occurring within TIAA-CREF[7] and *whether* the fruits of the TIAA-CREF investigation were shared with the government or *whether* the government found this information useful in their

---

[7]e.g. Mr. David E. Frimel, Senior Director Corporate Security and Safety, in a letter dated September 16, 2009 advised of a fraud involving Express Scripts, Inc. *See* PSR ¶ 44. Clearly, other frauds were being perpetrated upon TIAA-CREF prior to June 2010.

investigation. Questions likewise arise concerning the "necessity" of the credit monitoring of accounts-i.e. its relatedness to Stayman's offense. In addition, without documentation the reasonableness of the expenses can not be assessed; it can not be assumed but rather must be demonstrated by a preponderance of the evidence. In short, there is not a preponderance of the evidence to support an order of restitution which includes these TIAA-CREF other expenses. The restitution order should be limited to the sum of the actual loss to TIAA-CREF in the amount of $220,747.45 and the actual costs incurred by the victims of the KCPA fraud.

**CONCLUSION**

For the reasons stated, a sentence of 40 months, a variance from Stayman's Guidelines sentencing range of 87-108 months, is a sentence that is sufficient but not greater than necessary to satisfy the goals of sentencing.

Respectfully submitted,

/S/

Donna R. Newman
cc: AUSA Paul Tuchmann via email and ECF
    USPO Cheryl Fiorillo via email and ECF
    Shaka Stayman via first class mail